UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THOMAS J. ALLEMAN,                          CIVIL ACTION
individually and on behalf of
his minor children, JUSTIN
ALLEMAN AND KAITLYN ALLEMAN                 NO: 05-1653
                                            (c/w 05-1654)
VERSUS

OMNI ENERGY SERVICES CORP.                  SECTION: "R"


**<u>ORDER AND REASONS</u>**

This consolidated litigation arises out of a December 17,
2004 accident that occurred when a helicopter owned and operated
by defendant and third-party plaintiff Omni Energy Services
Corporation attempted to land on an oil production platform on
the outer Continental Shelf in the Gulf of Mexico.  Plaintiffs
Thomas Alleman (No. 05-1563) and Mark and Nancy Parker (No.
05-1654) sued Omni in this Court on May 4, 2005 for damages
arising out the accident.  Omni and its insurer, AIG Aviation,
filed a third-party complaint against W&T Offshore, Inc., the
platform owner, on December 15, 2005.  Omni's third-party
complaint seeks indemnification and defense costs from W&T.  In

the alternative, Omni asserts that it is entitled to contribution from W&T for any judgment against it.  Omni also seeks damages from W&T for the loss of Omni's helicopter.  Omni and W&T now cross-move for partial summary judgment on the issue of contractual indemnification.  For the reasons stated below, the Court DENIES both motions.

## I.   BACKGROUND

W&T owns and operates a number of oil and natural gas production leases for various locations on the outer Continental Shelf off the coast of the state of Louisiana.  W&T produces oil and gas at these locations through a number of production platforms that are permanently attached to the seabed on the outer Continental Shelf.  To carry out its oil and gas production operations, W&T contracts with a number of independent contractors, who in turn provide W&T with necessary personnel, services and equipment for its oil and gas production activities.

On April 27, 1999, W&T and Omni executed a Master Service Contract, under which Omni agreed to provide services to W&T. The MSC, which appears to be a standard form agreement used by W&T with its subcontractors, sets forth the general terms and conditions of the parties' relationship, but it provides no detail about the specific services to be provided by Omni.  The

2

pertinent detail is contained in a March 4, 2004 letter agreement between the parties.  The March 4, 2004 letter agreement states that Omni will provide W&T with "certain aircraft services" in accordance with the terms of the MSC, "in support of W&T's production operations."  *See* Hotard Decl. Ex. 2, at 1-2.

Paragraph 4 of the MSC contains a mutual indemnity clause, under which W&T agreed to indemnify Omni against claims by W&T employees, and Omni likewise agreed to indemnify W&T against claims by Omni employees.  *See id.* Ex. 1, ¶ 4.  The indemnity provision provides, in relevant part:

> 4.4  W&T shall release, indemnify, defend and hold the Contractor Group harmless from and against any and all Claims brought by the W&T Group (or their respective spouses, relatives or dependents) or any other party in respect of personal or bodily injury to, sickness, disease or death of, any member of the W&T Group in any way, directly or indirectly arising out of or related to the performance of the Contract or the use by the W&T Group, or their presence on, any premises owned, operated, chartered, or controlled by the W&T Group or used for transportation (including, but not necessarily limited to, any structure, platform or other artificial island, aircraft, vessel or other premises and including ingress and egress), regardless of the Cause(s).
>
> 4.5  In addition to Paragraph 4.4 above, W&T agrees to release, indemnify, defend and hold the Contractor Group harmless from and against any and all Claims (including, but not necessarily limited to, Claims for property damage, bodily injury, illness,

> disease, death or for loss of services, wages
> or for loss of consortium or society) which
> may be brought by any person or entity
> against the Contractor Group . . . in any
> way, directly or indirectly, arising out of
> or related to the performance of the Contract
> . . . expressly including any Claims actually
> or allegedly caused by the sole, concurrent
> or partial negligence (of whatever nature or
> character), fault or strict liability of the
> Contractor Group . . . .

*Id.* ¶¶ 4.4-4.5. The MSC also contains a choice of law clause, which provides, "The general maritime law of the United States shall govern this Contract." *See* Hotard Decl. Ex. 1, ¶ 13.

On December 17, 2004, Ernie Smith, an Omni pilot, shuttled personnel of W&T and its subcontractors by helicopter to and from W&T's various oil and gas production platforms. Thomas Alleman, a crane mechanic employed by W&T subcontractor Danos & Curole, and Bert Hollier and Mark Parker, both employees of W&T subcontractor Baker Energy Services, rode in the helicopter with Smith.

The accident occurred when Smith attempted to land the helicopter on W&T's Ship Shoal 130-E platform so that Hollier and Parker could perform a monthly inspection of the platform's fire equipment. At the time of the accident, W&T had stored a boat landing on the top deck of the platform, on or near the platform's helipad. As Smith attempted to land the helicopter on the platform, the helicopter's main rotor struck the boat

4

landing, causing the helicopter to skid in circles across the helipad.  As the helicopter spun, the tail boom fell off the helicopter and into the Gulf of Mexico.  The helicopter momentarily came to rest on the edge of the platform, but ultimately, it too fell from the platform into the Gulf of Mexico.

On May 4, 2005, plaintiffs Thomas Alleman and Mark and Nancy Parker sued Omni for damages in this Court.  The Court consolidated these actions on August 13, 2005.[1]  Omni and its insurer, AIG Aviation, filed a third-party complaint against W&T on December 15, 2005.  Omni asserts that it is entitled to indemnification and defense costs from W&T under the MSC, or, in the alternative, that Omni is entitled to contribution from W&T for any judgment against it.  Omni also alleges that the accident was caused by W&T's negligence and that W&T is therefore liable to Omni for the loss of its helicopter.  W&T and Omni each now move for partial summary judgment on the issue of whether Omni is entitled to indemnification and defense costs under the MSC.

---

[1]Three additional actions against Omni filed by the heirs of the other passenger, Bert Hollier, in the United States District Court for the Western District of Louisiana have recently been transferred to this Court and consolidated with these actions.

## II.  DISCUSSION

### A.  Legal Standard

Summary judgment is appropriate only when the pleadings and summary judgment evidence establish that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party has the burden of showing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue

6

exists.  *See Celotex*, 477 U.S. at 324.   The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  *See id*. at 325; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1996).

### B.   Applicable Law

The parties' dispute centers on whether the indemnity provisions of the MSC that require W&T to indemnify Omni are valid and enforceable.   To decide that issue, the Court must first determine what body of law governs the MSC and the March 4, 2004 letter agreement.   Omni argues that the contracts are governed by the general maritime law, while W&T argues that Louisiana state law applies, as surrogate federal law under the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356.   W&T further argues that the mutual indemnity clause in the MSC is unenforceable under the Louisiana Oilfield Anti-Indemnity Act, La. Rev. Stat. Ann. § 9:2780, which voids certain indemnity agreements in contracts relating to oil and gas exploration.

OCSLA was enacted in 1953 to extend the jurisdiction and control of the United States government to the seabed and subsoil of the outer Continental Shelf and to its natural resources.  *See Amoco Prod. Co v. Sea Robin Pipeline Co*., 844 F.2d 1202, 1205 (5th Cir. 1988).   To facilitate its statutory purposes, OCSLA

7

provides for the application of federal law to "the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom."  43 U.S.C. § 1333(a)(1).  Because federal statutory law may in some areas be inadequate to cover the full range of legal problems that can arise in connection with operations on the outer Continental Shelf, OCSLA incorporates state law as surrogate federal law on the outer Continental Shelf.  *See id.* § 1333(a)(2)(A) ("To the extent that they are applicable and not inconsistent with [federal law], the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for . . . the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon . . . .").

For state law to apply as surrogate federal law through OCSLA, three conditions must be satisfied:  "'(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures attached permanently or temporarily thereto)[;]  (2) Federal maritime law must not apply of its own force[; and] (3) The state law must not be inconsistent with Federal law.'"  *Texaco Exploration & Prod., Inc. v. AmClyde Eng'd*

*Prods. Co.*, --- F.3d ---, ---, 2006 WL 1195324, at *10 (5th Cir. 2006) (quoting *Union Tex. Petroleum Corp. v. PLT Eng'g*, 895 F.2d 1043, 1047 (5th Cir. 1990)).

1.   *OCSLA Situs*

To determine whether a dispute over the enforceability of a contractual indemnity clause arises on an OCSLA situs, the Fifth Circuit looks to the situs of the injury underlying the dispute. *See Demette v. Falcon Drilling Co.*, 280 F.3d 492, 496, 498 (5th Cir. 2002) (considering situs of underlying injury); *cf. Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1527 (5th Cir. 1996) (assuming, without deciding, that situs of injury rule is appropriate).  In this case, the underlying incident, the helicopter accident, occurred on an oil production platform fixed to the seabed on the outer Continental Shelf, so OCSLA's situs requirement is satisfied.[2]

2.   *Applicability of Maritime Law*

The Court next considers whether the general maritime

---

[2]That the helicopter ultimately fell into the Gulf of Mexico does not compel a different conclusion.  The Fifth Circuit has expressly rejected such a strict interpretation of the situs requirement.  *See Hodgen*, 87 F.3d at 1527; *Hollier v. Union Tex. Petroleum Corp.*, 972 F.2d 662, 664-65 (5th Cir. 1992).

applies of its own force to the parties' agreements and thereby precludes the application of Louisiana law through OCSLA.  As an initial matter, the Court notes that parties cannot contract around OCSLA's statutory choice of law provision.  *See Texaco Exploration & Prod., Inc.*, 2006 WL 1195324, at *8 & n.8 (OCSLA's "statutory choice of law provisions are not subject to exception by the parties' agreement"); *Union Tex. Petroleum Corp.*, 895 F.2d at 1050 (under OCSLA, "the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary").  Accordingly, the MSC's choice of law clause selecting the application of general maritime law does not affect the Court's analysis of the applicable law.

Maritime law could nevertheless govern the parties' contracts if the Court determines that they are maritime contracts.  The line separating maritime contracts from nonmaritime contracts is "conceptual rather than spatial," and whether an agreement is considered a maritime contract depends on the nature of the agreement itself.  *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1965).  Recently, in *Norfolk Southern Railway Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14 (2004), the Supreme Court elaborated on the *Kossick* standard and set forth a number of general principles to guide courts in determining whether a contract is maritime in nature.  First, courts cannot simply ask

"whether a ship or other vessel was involved in the dispute."
*Norfolk S. Ry. Co.*, 543 U.S. at 23.  Nor can courts focus solely
on "the place of the contract's formation or performance."  *Id.*
at 24.  Rather, the dispositive inquiry is "whether the principal
objective of [the] contract is maritime commerce."  *Id.* at 25.

*Norfolk Southern Railway Co.* involved a so-called "through"
bill of lading, a single bill of lading under which "cargo owners
can contract for transportation across oceans and to inland
destinations in a single transaction."  *Id.* at 26.  The specific
bill of lading at issue in *Norfolk Southern Railway Co.* covered
the shipment of goods by sea from Australia to Georgia, as well
as land transportation from Georgia to Alabama.  *Id.* at 19.  The
sea leg of the journey was successful, but the train carrying the
cargo from Georgia to Alabama derailed en route, causing
approximately $1.5 million in damage to the cargo.  *Id.* at 21.

The Court found that the entire bill of lading was a
maritime contract governed by federal law, because its "primary
objective [was] to accomplish the transportation of goods by sea
from Australia to the eastern coast of the United States."  *Id.*
at 24.  In reaching this conclusion, the Court emphasized that,
notwithstanding that the bill of lading expressly provided for
some transportation over land and that the cargo was damaged
while being transported over land, the bill of lading also

11

required substantial transportation by sea.  The Court found that the principal purpose of the contract was therefore to promote maritime commerce.  *Id.* at 27 ("Conceptually, so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce--and thus it is a maritime contract.  Its character as a maritime contract is not defeated simply because it also provides for some land carriage.").

Before the Supreme Court's decision in *Norfolk Southern Railway Co.*, courts in the Fifth Circuit applied the multi-part test of *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir. 1990), to decide whether an agreement is or is not a maritime contract.  Like the Supreme Court in *Kossick* and *Norfolk Southern Railway Co.*, the *Davis & Sons* court focused its analysis on the nature of the contract itself, "rather than on its place of execution or performance."  *Davis & Sons*, 919 F.2d at 316. Under *Davis & Sons*, to determine whether a contract is maritime or nonmaritime in nature, a court must undertake two inquiries. First, the court should look to the historical treatment of such contracts in the case law.  *Id.*  Second, the court should analyze six specific factors about the contract at issue:[3]

---

[3]When, as here, the contract consists of a master agreement and a later, more specific agreement, "the two must be

> 1) what does the specific work order in
> effect at the time of injury provide? 2) what
> work did the crew assigned under the work
> order actually do? 3) was the crew assigned
> to work aboard a vessel in navigable
> waters[?] 4) to what extent did the work
> being done relate to the mission of that
> vessel? 5) what was the principal work of the
> injured worker? and 6) what work was the
> injured worker actually doing at the time of
> the injury?

*Id.* at 316.

The Fifth Circuit has not expressly decided whether the *Davis & Sons* test remains the appropriate standard in this circuit after *Norfolk Southern Railway Co.*, but the Court predicts that if the Fifth Circuit were presented with the question, it would find that *Norfolk Southern Railway Co.* did not alter this circuit's standards for determining whether a contract is maritime or non-maritime. Several considerations support this conclusion. First, *Norfolk Southern Railway Co.* did not purport to change existing law. Rather, it simply restated and clarified *Kossick*'s "conceptual" approach for determining whether a contract is maritime. Indeed, the Court specifically stated that it was applying the principles that it had previously articulated in *Kossick*. *Norfolk S. Ry. Co.*, 543 U.S. at 23 ("Applying the

---

interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions." *Davis & Sons*, 919 F.2d at 315.

two-step analysis from *Kossick*, we find that federal law governs this contract dispute."). Second, the multi-factor *Davis & Sons* inquiry is designed to determine the nature of the contract in a manner consistent with the mandate of *Kossick* and *Norfolk Southern Railway Co.* that courts focus on the overall character of the contract, rather than on discrete factors as the place of the contract's formation or performance. *See Davis & Sons*, 919 F.2d at 316 (whether contract is maritime or non-maritime "depends . . . on the 'nature and character of the contract,' rather than on its place of execution or performance") (citing *North Pacific S.S. Co. v. Hall Bros Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919), and *Kossick*, 365 U.S. 731). Finally, the Fifth Circuit has applied the *Davis & Sons* test on at least one occasion since *Norfolk Southern Railway Co.* was decided. *See Hoda v. Rowan Cos.*, 419 F.3d 379, 381 (5th Cir. 2005) (considering *Davis & Sons* factors, but not discussing *Norfolk Southern Railway Co.*). Accordingly, the Court predicts that the Fifth Circuit would continue to apply *Davis & Sons* as the appropriate standard to determine whether a contract is maritime in nature.

The parties have not provided, and the Court has not found, any relevant case law classifying a contract for flight services in connection with offshore oil and gas production activities as

14

either maritime or non-maritime.  The Court will therefore
proceed directly to the six *Davis & Sons* factors.

In this case, the *Davis & Sons* factors favor classifying the
MSC and the March 4, 2004 letter agreement as non-maritime
contracts.  No specific work order was in effect at the time of
the injury, so the pertinent agreement is the March 4, 2004
letter agreement, under which Omni agreed to provide W&T with
aircraft services in support of W&T's oil and gas production
activities.  The helicopter pilot, Ernie Smith, used the
helicopter to transport employees of W&T and its subcontractors
to and from W&T's production platforms.  Thus, the relevant
"crew" was assigned to a helicopter, not a vessel, and, for that
same reason, the work being done also bore no relation to the
mission of a vessel.  *See Barger v. Petroleum Helicopters, Inc.*,
692 F.2d 337, 339 (5th Cir. 1982) ("[W]e conclude that a
helicopter cannot be considered a 'vessel' . . . .").  Moreover,
on the record before the Court, the principal work of the injured
workers was conducted on W&T's production platforms, which are
not vessels.  *See, e.g.*, *Becker v. Tidewater, Inc.*, 335 F.3d 376,
391 (5th Cir. 2003).  Finally, at the time of the accident, the
injured employees were being transported to and from W&T's
various production platforms so that they could perform their
duties on the platforms.  None of these factors suggests that the

15

agreements between Omni and W&T have a maritime purpose.

It is clear that an agreement to transport workers and supplies to and from offshore production platforms *in a vessel* is a maritime contract,[4] but the Court is not persuaded that a contract to provide similar services by helicopter can likewise be classified as a maritime contract.  The key difference between the two types of contracts is that, unlike an agreement to transport workers to and from fixed offshore production platforms *on* water in a *vessel*, the purpose of a contract to transport workers to and from platforms *over* water in an *aircraft* is not to effectuate maritime commerce.  *See Norfolk S. Ry. Co.*, 543 U.S. at 25 (stating that the inquiry should focus on "whether the principal objective of a contract is maritime commerce").  Although *Norfolk Southern Railway Co.* makes it clear that factors such as whether the accident took place upon a vessel or whether the contract was performed on navigable waters are not themselves determinative of whether a contract is maritime, those factors are nevertheless relevant to the ultimate inquiry of whether the primary purpose of the contract is to promote maritime commerce.  Indeed, in *Norfolk Southern Railway Co.* itself, the Court's characterization of the bill of lading at issue ultimately turned

---

[4] *See Johnson v. SEACOR Marine Corp.*, 404 F.3d 871, 877 (5th Cir. 2005).

on whether it contemplated substantial transportation *on water*. *See id.* at 27 ("[S]o long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce--and thus it is a maritime contract. . . . If a bill's *sea* components are insubstantial, then the bill is not a maritime contract.").

In this case, the MSC and the March 4, 2004 letter agreement between W&T and Omni provide exclusively for transportation services by aircraft between the shore and W&T's numerous fixed offshore platforms, to assist W&T's oil and gas production operations. The agreements do not contemplate any services that are distinctly maritime in nature; indeed, the contracts could be performed in their entirety without the use of a vessel or any transportation on water. Under these circumstances, the Court cannot conclude that the contracts' purpose was to promote or effectuate maritime commerce.

Omni relies on a number of cases that upheld the exercise of admiralty jurisdiction over tort claims for wrongful death or personal injury arising out of helicopter crashes that occurred en route to an offshore platform. Those cases hold that the use of a helicopter to carry workers and supplies to and from offshore platforms "bears the type of significant relationship to traditional maritime activity which is necessary to invoke

17

admiralty jurisdiction." *LeDoux v. Petroleum Helicopters, Inc.*, 609 F.2d 824, 824 (5th Cir. 1980); *see also Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 218-19 (1986) (finding admiralty tort jurisdiction in case involving helicopter crash because the "helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from an 'island,' albeit an artificial one, to the shore"); *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1112 (5th Cir. 1982) (quoting *LeDoux*). But *Tallentire*, *LeDoux* and *Smith* are inapposite. As W&T correctly notes, none of those cases considered the question of whether a contract for services was maritime or non-maritime. Rather, each of those cases dealt exclusively with admiralty tort jurisdiction, which is a wholly distinct inquiry that focuses on (i) whether the tort has a maritime locality; and (ii) whether there is a connection with, or relationship to, maritime activity. *See Texaco Exploration & Prod., Inc.*, 2006 WL 1195324, at *6. Although the use of a helicopter to transport workers to and from offshore platforms may have a "significant relationship" to maritime activity because it is analogous to the traditional maritime activity of transporting workers and supplies by vessel, the analogy to traditional maritime activities cannot suffice to transform a contract to provide what is otherwise a non-maritime service, air transportation, into one whose purpose is to

18

effectuate maritime commerce.  *See Am. Home Assurance Co. v. Merck & Co.*, 329 F. Supp. 2d 436, 441 (S.D.N.Y. 2004) (rejecting argument that "where an aircraft performs a function traditionally accomplished by waterborne vessels (for example, a 'transoceanic crossing'), that aircraft's flight constitutes maritime activity").[5]  To hold otherwise would be to find that any contract for oversea air transportation, such as a transatlantic passenger ticket on a commercial airline, is necessarily a maritime contract because transporting people and property over water is a traditional maritime activity historically performed by vessels.  None of the authorities cited by Omni can support such a logical leap.

Finally, in a somewhat analogous context, other courts construing service agreements related to offshore oil and gas production have found that the use of helicopters, rather than vessels, in the performance of a contract can be an indicator that the contract is not maritime in nature.  In *Hodgen*, for

---

[5]At oral argument, Omni relied heavily on the Fifth Circuit's decision in *Barger* for the proposition that a helicopter carrying persons and property to and from offshore platforms is actually "engaged in maritime activit[y]," as opposed to activity that is simply analogous to maritime activity.  A review of *Barger*, however, reveals that the language relied on by Omni is actually contained in the dissenting opinion of Judge Brown.  *See Barger*, 692 F.2d at 343 (Brown, J., dissenting).  The majority opinion in that case provides no support for Omni's position.

example, a contractor's employee was injured as he transferred from a platform to a vessel that was to transport him to another platform.  In finding that the service agreement between the platform owner and the contractor was non-maritime in nature, the Fifth Circuit noted that the contractor "did not have to provide or use a vessel to comply with its contractual obligations and [that the contractor's] personnel were often taken to various platforms in the 255 group by helicopter."  *Hodgen*, 87 F.3d at 1528; *see also LeBouf v. Canal Barge Co.*, 205 F. Supp. 2d 561, 565 (E.D. La. 2002) (contract for services to be performed on platform was non-maritime in nature; "[The employees'] transportation to and from platforms was incidental to their work on Freeport's platforms.  In fact, it is not seriously disputed that Baker's employees were often transported by helicopter."). Although not precisely on point, these cases further undermine Omni's argument that transporting people over water by helicopter is a maritime activity that is legally indistinguishable from transporting people in a vessel.

Thus, the Court finds that the agreements between Omni and W&T are not maritime contracts, and maritime law does not therefore apply of its own force in this case.

3.   *Conflict with Federal Law*

The final inquiry is whether the application of Louisiana law, specifically, the Louisiana Oilfield Anti-Indemnity Act, through OCSLA, would conflict with federal law.  The Fifth Circuit has expressly held that nothing about the Anti-Indemnity Act conflicts with federal law.  *See Hodgen*, 87 F.3d at 1528 ("We find nothing in the LOIA inconsistent with federal law."); *see also LeBouf*, 205 F. Supp. 2d at 566 ("LOIA is consistent with federal law.").  Omni presents no arguments that would call this conclusion into question.  Accordingly, the Court finds that applying Louisiana law would not conflict with federal law.  The MSC and the March 4, 2004 letter agreement are therefore governed by Louisiana law through the application of OCSLA.

**C.   The Louisiana Oilfield Anti-Indemnity Act**

The Court must now consider whether the Anti-Indemnity Act renders the indemnity provisions of the MSC ineffective in this case.  The Anti-Indemnity Act provides, in pertinent part:

> Any provision contained in, collateral to, or
> affecting an agreement pertaining to a well
> for oil, gas, or water, or drilling for
> minerals . . . is void and unenforceable to
> the extent that it purports to or does
> provide for defense or indemnity, or either,
> to the indemnitee against loss or liability
> for damages arising out of or resulting from
> death or bodily injury to persons, which is

21

> caused by or results from the sole or
> concurrent negligence or fault (strict
> liability) of the indemnitee . . . .

La. Rev. Stat. Ann. § 9:2780(B).  The statute specifically

defines an "agreement" pertaining to a well to include "the

furnishing or rental of . . . incidental transportation, and

other goods and services furnished in connection with any such

service or operation."  Id. § 9:2780(C).

The Louisiana Supreme Court has held that the Anti-Indemnity

Act completely "nullifies any provision in any agreement that

requires defense and/or indemnification where there is any

negligence or fault on the part of the indemnitee." *Meloy v.

Conoco, Inc.*, 504 So. 2d 833, 838 (La. 1987).  The *Meloy* court

also made clear, however, that the Anti-Indemnity Act is

triggered only once there has been a judicial finding that the

indemnitee was at fault.  *See id.* at 839 ("The Act does not apply

where the indemnitee is not negligent or at fault. . . .  Whether

an oil company (indemnitee) is free from fault and thus outside

the scope of the Act can only be determined after a trial on the

merits."); *Am. Home Assurance Co. v. Chevron USA, Inc.*, 400 F.3d

265, 268-70 (5th Cir. 2005) (holding that district court

prematurely granted summary judgment on indemnity claim without

providing opposing party opportunity to establish indemnitee's

fault).  Thus, the Act does not prohibit the indemnitee from

22

seeking indemnification for its defense costs if the indemnitee is ultimately found to be without fault.  *Meloy*, 504 So. 2d at 839 ("If it is established at trial that there is no 'negligence or fault (strict liability) on the part of the indemnitee,' the Act does not prohibit indemnification for cost of defense.").

In this case, Omni seeks both defense costs and indemnification from W&T.  To date, however, there has been no judicial determination of whether Omni was at fault for the accident.  The Court cannot therefore decide at this point whether the Anti-Indemnity Act applies and bars Omni's claims. Although W&T argues in passing that the Anti-Indemnity Act necessarily applies because all of the plaintiffs' claims against Omni allege negligence, this argument is clearly foreclosed by *Meloy*.  *See id.*  Accordingly, the Court is compelled to conclude that summary judgment on the enforceability of the MSC's indemnity provisions is premature.

**III. CONCLUSION**

For the reasons stated above, the Court DENIES W&T's and Omni's cross motions for partial summary judgment.

New Orleans, Louisiana, this __7th__ day of June, 2006.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE